Page 1

1        IN THE UNITED STATES DISTRICT COURT
2           NORTHERN DISTRICT OF OHIO
3              EASTERN DIVISION
4
            ~~~~~~~~~~~~~~~~~~~~
5
6 OUTDOOR PRODUCT INNOVATIONS,
   INC.,
7
8        Plaintiff,
9
       vs.            Case No. 1:18-CV-02457
10
11 JEST TEXTILES, INC., et al.,
12
       Defendants.
13
14           ~~~~~~~~~~~~~~~~~~~~
15
             Deposition of
16              JAMES LEVIS
17
            June 21, 2019
18              9:49 a.m.
19              Taken at:
20  Singerman, Mills, Desberg & Kauntz Co., L.P.A.
21      3333 Richmond Road, Suite 370
22           Beachwood, Ohio
23
24
25     Renee L. Pellegrino, RPR, CLR

**EXHIBIT 1**

Page 6

1    MR. STAVNICKY: We're here for the
2 continued deposition of Outdoor Product
3 Innovations representatives under the 30(b)(6)
4 that we issued.
5    JAMES LEVIS, of lawful age, called for
6 examination, as provided by the Federal Rules
7 of Civil Procedure, being by me first duly sworn,
8 as hereinafter certified, deposed and said as
9 follows:
10    EXAMINATION OF JAMES LEVIS
11 BY MR. STAVNICKY:
12    Q. Can you state your name for the
13 record, please?
14    A. James Levis.
15    Q. And spell your last name, please.
16    A. L-e-v-i-s.
17    Q. And what's your home address?
18    A. 131 Barrington Court, Elyria, Ohio
19 44035.
20    Q. Can you repeat the address?
21    A. 131 Barrington Court.
22    Q. Elyria?
23    A. Elyria.
24    Q. What's the zip?
25    A. 44035.

Page 7

1    Q. Have you had your deposition taken
2 before, this process?
3    A. Yes, I have.
4    Q. About how many times?
5    A. About five.
6    Q. What types of cases?
7    A. Three times I was an expert witness;
8 twice I was, I guess, a witness of fact.
9    Q. Roughly how long ago were the
10 depositions, like in the last ten years, 20
11 years?
12    A. Probably -- the last one was
13 probably in the last four years, and the other
14 ones would have been in the last five to 15.
15    Q. The two times that you were a fact
16 or a business witness, not an expert witness,
17 what were those cases?
18    A. One was involving a divorce. The
19 other was regarding a business dispute.
20    Q. Did it have anything to do with this
21 case or with OPI?
22    A. No.
23    Q. Totally different clients?
24    A. Totally different.
25    Q. Nothing to do with Dan Reaser?

Page 8

1    A. Nothing to do with Mr. Reaser.
2    Q. Same with the divorce, nothing to do
3 with Mr. Reaser?
4    A. Nothing to do with Mr. Reaser.
5    Q. In the instances you were an expert,
6 can you recall the names of the folks who hired
7 you?
8    A. The one I was hired by -- the one
9 that was a divorce case, I was hired actually by
10 the court to do a valuation of the business.
11    Q. By Lorain Court or where was it?
12    A. It was Cuyahoga County.
13    Q. Hired by the court?
14    A. Yes.
15    Q. And that was a divorce?
16    A. That was a divorce case, valuation
17 of a business.
18    Q. What was the next one?
19    A. The next one was in Lorain County
20 Court. It had to do with value of a land
21 contract.
22    Q. Do you remember who your client was
23 or who the party was?
24    A. Once again, I was hired -- in that
25 case I was hired by the law firm.

Page 9

1    Q. Which law firm?
2    A. Trigilio Stephenson.
3    Q. And what was the third instance as
4 an expert?
5    A. The third one was a business dispute
6 between two contractors.
7    Q. Contractors like construction
8 contractors?
9    A. Construction contractors, correct.
10    Q. And who hired you in that one?
11    A. The attorney.
12    Q. Who was the attorney?
13    A. I don't recall his name.
14    Q. Do you remember where it was?
15    A. It was in Cuyahoga County.
16    Q. Did any of these five ever involve
17 Mr. Reaser or OPI?
18    A. No.
19    Q. Or American Hood?
20    A. None of them involved any of
21 Mr. Reaser's entities.
22    Q. So just stand-alone cases?
23    A. Correct.
24    Q. All right. So you've had a decent
25 amount of experience with a deposition, so I'll

Page 26

1 Q. Tax day. Fun for you. Well, no.
2 Not quite tax day.
3     MR. CUPPAGE: Close enough.
4 Q. What was the sale? Was it an asset
5 sale? Was it a stock sale?
6 A. It was an asset sale.
7 Q. After the sale did you have any
8 affiliation with American Hood?
9 A. No.
10 Q. So once the sale is done, your work
11 with American Hood was done?
12 A. I did one project for the accounting
13 firm that purchased American Hood.
14 Q. When you say "accounting firm," you
15 mean Weinberg Capital?
16 A. I wean Weinberg Capital's accounting
17 firm.
18 Q. Do you remember who their accounting
19 firm was?
20 A. I'm picturing their logo and I'm not
21 coming up with their name.
22 Q. If it pops up in your head at some
23 point, give me a holler. Regional firm,
24 national?
25 A. Local, over here.

Page 27

1 Q. And I apologize. You said it was an
2 asset sale?
3 A. Yes.
4 Q. Mr. Reaser was a little unsure,
5 because it was complex, I think the exact nature
6 of what it was. Was he still a shareholder or
7 owner post-sale?
8 A. He was a minority shareholder in an
9 entity that they had established.
10 Q. Like they set up a single asset
11 holding company or something?
12 A. I'm not quite sure, but he was a
13 minority shareholder in one of the entities they
14 had set up.
15 Q. Do you know the name of the entity?
16 A. I don't recall.
17 Q. Is he still a minority owner?
18 A. No, he's not.
19 Q. Was there an earn-out or buy-out or
20 was it just supposed to end at some point?
21 A. They just bought him out.
22 Q. Do you know when that happened?
23 A. Sometime in 2017.
24 Q. Did they have an option to buy him
25 out? Was it something that was preplanned or

Page 28

1 not?
2 A. It was a mutual agreement between
3 the two of them.
4 Q. I appreciate your answer. What I'm
5 saying is, it wasn't as if in the original sale
6 documents there was like a landmark date that he
7 would be bought out by X?
8 A. No, there was not.
9 Q. It was just a mutual deal after the
10 fact?
11 A. Correct.
12 Q. Because I've seen it with deals
13 where there's a purchase of a former business
14 and there's like an earn-out and then there's
15 like a window for that person, they'll be an
16 employee for two years and then they go away
17 because they need to transition.
18 A. Um-hum.
19 Q. When did you start working with OPI?
20 And by OPI, I mean Outdoor Product Innovations.
21 A. Since its inception.
22 Q. Which was approximately '15?
23 A. 2015, correct.
24 Q. Did OPI and American Hood ever
25 simultaneously exist?

Page 29

1 A. Yes.
2 Q. For about how long?
3 A. Approximately a year.
4 Q. When it first started, what did you
5 do for OPI?
6 A. Very little. Probably just the tax
7 work for it.
8 Q. Have you ever been a W-2 employee of
9 OPI?
10 A. No, I have not.
11 Q. When did your work or
12 responsibilities transition at OPI, like what
13 time frame?
14 A. Probably in 2017.
15 Q. And what did your responsibilities
16 become then?
17 A. As the company started to grow and
18 develop product, I sat down and started doing
19 budgeting work with Mr. Reaser, analyzing
20 potential product lines.
21 Q. Initially did you have an office at
22 OPI?
23 A. No, I did not.
24 Q. Do you currently?
25 A. I currently share an office, yes.

Page 30

1 Q. Who do you share it with?
2 A. Mrs. Reaser.
3 Q. Mrs. Reaser, his wife, or his
4 daughter?
5 A. Wife.
6 Q. Sorry. The Mrs. Thank you.
7 What's her first name?
8 A. Mila.
9 Q. Say it again.
10 A. Mila, M-i-l-a.
11 Q. And currently how many days a week
12 are you at OPI's offices?
13 A. Currently it's as needed. So right
14 now I'm probably there a day, day and a half.
15 Q. So at this point in time it's a
16 little bit less than it was at the end of
17 American Hood, you spend a little bit more time
18 with your accounting firm than at OPI?
19 A. Correct.
20 Q. How many partners or owners of your
21 accounting firm are there?
22 A. Two.
23 Q. Just the two named partners?
24 A. Yes.
25 Q. And for the time frame of the end of

Page 31

1 2017 to the present, what are your
2 responsibilities for OPI?
3 A. My responsibility is I probably meet
4 weekly or daily with Cathy Nadolski, their
5 accounting person. I'm available by phone to
6 her. She probably calls me several times a week
7 to bounce transactions off of me. Any help
8 Cathy needs with specific accounting issues, I
9 go over and help her with that. The other part
10 is as Mr. Reaser is investigating different
11 things and businesses, I do a lot of special
12 projects for him.
13 Q. Like looking into the products or
14 looking into the background of the companies?
15 What type of special projects?
16 A. Looking into profitability of sales,
17 reviewing potential new products that we would
18 develop, the profitability of that, the gross
19 margin on those. Things like that. And if
20 there's any issue with the accounting system,
21 I'll take a look at that. I help them set up
22 inventory controls so that we know that we have
23 the product in place to deliver timely. I've
24 also helped him sit down and do projections for
25 inventory to make sure the quantities that we

Page 32

1 ordered were correct.
2 Q. What's the accounting software that
3 they use; do you know?
4 A. They use -- it is QuickBooks for
5 manufacturers.
6 Q. And has it always been QuickBooks
7 for manufacturers since OPI began?
8 A. Yes.
9 Q. When did you first become aware of
10 Jest Textiles?
11 A. Mr. Reaser called me in the
12 beginning of May of 2018 and asked me to attend
13 a meeting with Jest Textiles.
14 Q. Prior to May of 2018 no dealings
15 with them?
16 A. No dealings with them. I was
17 somewhat familiar with their name because I had
18 seen their name in purchasing journals up until
19 then, but no contact with them before that.
20 Q. So Mr. Reaser testified the other
21 day that there was some smaller projects that
22 they had worked on with Jest Textiles I think
23 from between 2015 and 2017, like maybe 12,
24 10,000 units. You wouldn't have been involved
25 in that?

Page 33

1 A. I had no involvement in that.
2 Q. And you wouldn't have been involved
3 in conversations with Kerry Forsdahl or Doug
4 Graves in October, November or December of '17?
5 A. No, I would not.
6 Q. Have you ever met Kerry?
7 A. Yes, I have.
8 Q. How many times?
9 A. Once.
10 Q. At that meeting in May?
11 A. Correct.
12 Q. Of 2018?
13 A. I'm sorry. I've met her three
14 times, once in the meeting in May, once at the
15 federal court, and when she was here to give her
16 deposition.
17 Q. But only once out of court
18 proceedings?
19 A. Correct.
20 Q. Have you ever met Doug?
21 A. No.
22 Q. Or Maryann Vinci?
23 A. I've never met Maryann.
24 Q. Have you ever been to China?
25 A. I have never been to China.

Page 34

1  Q. Which answers the question you have
2 never met with any of the manufacturers or
3 suppliers for Jest that are in China?
4        THE WITNESS: Can I have a minute
5 with Mr. Cuppage, please?
6        MR. STAVNICKY: Sure.
7        (Short recess had.)
8        MR. STAVNICKY: Back on the record.
9  A. I met with one of the suppliers.
10 Q. In the U.S.?
11 A. In the U.S.
12 Q. Who was the supplier?
13 A. Nine Bulls.
14 Q. When was that?
15 A. Two weeks ago.
16 Q. Was the meeting with regard to
17 hunting blinds?
18 A. The meeting was just a meeting to
19 get to know them.
20 Q. Was the meeting in the Cleveland
21 area?
22 A. Yes.
23 Q. And who did you meet with?
24 A. The owner and his daughter-in-law.
25 Q. Do you know their names?

Page 35

1  A. No.
2  Q. Can you try to get their names?
3  A. I can tell you -- well, I guess the
4 daughter-in-law's name, she goes by Crystal in
5 this country, and I do not have a clue on the
6 gentleman's name.
7  Q. So is it a fair statement to say
8 that the first time you had any -- I'm trying to
9 think of the best term -- any significant
10 dealings with Jest is May of 2018?
11 A. Correct.
12 Q. And that's the first time? Whether
13 through OPI or Kerry, that was the first time
14 you really got involved in that process?
15 A. Correct.
16 Q. What was the purpose of your
17 involvement in May of '18?
18 A. Mr. Reaser contacted me to say they
19 were doing this project with Jest, he was
20 concerned about the amount of money that had
21 been paid to Jest and the lack of results that
22 he felt, and he felt that he needed me to get
23 involved to help him with the accounting and to
24 actually see what was going on and to put the
25 controls in place to make sure that we were

Page 36

1 paying for what we were receiving.
2  Q. Prior to May of 2018, though, you
3 wouldn't have been involved in issuing purchase
4 orders to Jest?
5  A. No, I would not have.
6  Q. Or the prior payments to Jest from
7 whatever, 2015 to May of 2018?
8  A. No, I would not have been involved.
9  Q. So when you do, for example --
10 looking at Exhibit 35, which lists payments to
11 Jest --
12 A. Yes.
13 Q. -- you're relying upon information
14 that you've received from the folks at OPI?
15 A. No.
16 Q. What are you relying upon?
17 A. Information I received from Jest.
18 Q. This is information from Jest on the
19 payments?
20 A. Correct.
21 Q. How do you cross-confirm it with
22 OPI?
23 A. Okay. What would happen -- I can
24 walk you through the whole process.
25 Q. Um-hum.

Page 37

1  A. What would happen is Maryann at Jest
2 would send me a copy of the invoice. Generally
3 I would receive the copy of the invoice when the
4 product went to port in China. Then I would
5 receive generally an e-mail from her either
6 later that week or the following week saying
7 these invoices need to get paid. I would go
8 over to OPI at that point. I would meet with
9 Mick Maynard, who had a program on his computer
10 that would give us the status of all the ships
11 and where the order was. After I would confirm
12 that the product was due in port timely, then we
13 would -- then I would check off the invoices
14 that those pertained to. Mr. Reaser and I would
15 get together, I would review the status of those
16 invoices and those shipments with him, and then
17 we would authorize payment to Jest.
18 Q. You couldn't authorize payment to
19 Jest?
20 A. No. I would make recommendations
21 and I would walk -- make the recommendations
22 based on the verbal agreements that we had with
23 Kerry and Jest.
24 Q. And I'm using an example, but if
25 Mr. Reaser said "Don't pay that," you can't

Page 38

1 supersede him?
2   A.  No, I cannot.
3   Q.  Was there anyone other than
4 Mr. Reaser that had the ultimate authority to
5 decide to pay or not pay?
6   A.  No, there was not.
7   Q.  So I'm going to give you an easy out
8 here because it streamlines our day here today.
9 You were not involved with the negotiation of
10 the original purchase orders, correct?
11   A.  Correct.
12   Q.  Or the terms of shipment? Were you
13 involved with the original negotiation of the
14 terms of shipment?
15   A.  I was not.
16   Q.  Were you involved with the original
17 negotiations of the terms of payment?
18   A.  Not the original I was not.
19   Q.  Were you involved with the initial
20 determination of who would pay freight?
21   A.  No, I was not.
22   Q.  Were you involved with the initial
23 determination and negotiations on who would pay
24 taxes or duty?
25   A.  No, I was not.

Page 39

1   Q.  Do you have a title currently at
2 OPI?
3   A.  Yes.
4   Q.  What's your title?
5   A.  Chief financial officer.
6   Q.  And when did you get that title?
7   A.  1-1-19. That's when it was
8 formalized.
9   Q.  But still not an employee?
10   A.  Still not an employee.
11   Q.  Do you get a payment in addition to
12 the bills for consulting?
13   A.  No, I do not.
14   Q.  So there's no separate distinct
15 payment even if it's a 1099 for being the CFO?
16   A.  All the invoices come through Levis
17 Seguin. I do this for two other companies on a
18 limited basis.
19   Q.  Outside CFO?
20   A.  Yes. On a limited basis as well.
21   Q.  What are the other companies?
22        MR. CUPPAGE: Are you going to
23 object to that?
24   A.  I'm going to object to that. I'll
25 tell you the industries that they're in but I

Page 40

1 cannot specifically give you my clients' names.
2   Q.  Tell me the industries, and then I'm
3 going to try to go around that as best I can.
4   A.  I have an engineering firm that I do
5 it for and I have a law firm that I do it for.
6   Q.  Do they have any affiliation with
7 OPI?
8   A.  They have none.
9   Q.  Or with Mr. Reaser?
10   A.  None whatsoever.
11   Q.  With Jest?
12   A.  None whatsoever.
13   Q.  Or with this lawsuit?
14   A.  None whatsoever.
15   Q.  As of the beginning of your
16 involvement with Jest on a more significant
17 basis -- we're going to use kind of May of 2018
18 as the line of demarcation -- what was your
19 understanding of the deal between OPI and Jest?
20   A.  The day -- and I guess I'm not clear
21 with what you're asking me.
22   Q.  What's your understanding of what
23 the contractual arrangement was between OPI and
24 Jest?
25        MR. CUPPAGE: And you're referring

Page 41

1 to when he first became involved?
2   Q.  After you become involved, yes.
3        MR. CUPPAGE: I think that's what
4 you said. I just want to make sure.
5   A.  Jest was going to provide blinds to
6 OPI.
7   Q.  Did you have an understanding after
8 May of 2018, as of May or after May, at any
9 point after May 1st, 2018, who was supposed to
10 pay duty or tariffs?
11   A.  My understanding was that OPI was to
12 receive their blinds full cost, full absorption
13 cost, included all expenses.
14   Q.  Where did you get that understanding
15 from?
16   A.  My understanding is from
17 conversations that I had with Kerry,
18 conversations that I had with Mr. Reaser,
19 conversations that were going on when I was in
20 the room.
21   Q.  Conversations with Kerry?
22   A.  Yes.
23   Q.  Is it your testimony that you heard
24 Kerry Forsdahl or anybody from Jest say duty is
25 Jest's responsibility or tariffs are Jest's

Page 70

1   A.   Yes.
2   Q.   But you never went through it?
3   A.   No. This was sent to me by
4 Mr. Reaser as a way of me holding and making
5 sure we had all these accumulated together.
6   Q.   We can look at number 12. Again,
7 this is another e-mail chain between yourself
8 and Maryann Vinci at Jest, correct?
9   A.   Correct.
10  Q.   Again, if you look at the top, it's
11 talking about payment and it says in the subject
12 line "Urgent," this time with three exclamation
13 points.
14       Do you see that --
15  A.   Yes.
16  Q.   -- the subject line?
17  A.   Yes.
18  Q.   And Maryann is informing you -- the
19 last sentence of the top part of the e-mail
20 says, "We cannot move them until all these
21 invoices are paid."
22       Do you see that?
23  A.   Yes.
24  Q.   Take a look at Defendants' Exhibit
25 14. It's another e-mail between Maryann,

Page 71

1 yourself, Samantha Hamilton and Kerry Forsdahl,
2 again requesting payments and tracking the
3 invoices and the amounts that are due?
4   A.   Yes.
5   Q.   And if there's ever a time, other
6 than the one you referenced, where I'm showing
7 you a document that you've never seen before or
8 something like that, please let me know because
9 we're trying to confirm that these have been
10 received by you.
11  A.   Yes.
12  Q.   Take a look at Exhibit 16.
13  A.   Yes.
14  Q.   It's an e-mail from Kerry dated
15 October 12th, 2018 to you, subject line "Current
16 situation," which I think is right around the
17 time of the lawsuit.
18       Correct me if I'm wrong, and I'm
19 going to be paraphrasing, but she's informing
20 you, on behalf of OPI, that there are containers
21 in the U.S. that have not been paid for?
22  A.   I think it's contrary to that.
23  Q.   Go ahead.
24  A.   The very first sentence says --
25  Q.   I'm sorry. That have been paid for.

Page 72

1   A.   Yes, that we have four containers
2 here that have been paid for.
3   Q.   Was there a wire to C&H at that
4 time?
5   A.   No, there was not.
6   Q.   The second paragraph, she says, "The
7 second issue is the remaining containers that
8 are in port or on the way that have not been
9 paid for by OPI." So one portion is containers
10 where there's payment, one portion is containers
11 there or en route where there's no payment. Is
12 that a fair statement of her assessment?
13  A.   Correct.
14  Q.   She then references, the third
15 sentence of that second paragraph, "We never
16 received any cancellations on any of these
17 orders."
18       Do you see that?
19  A.   Yes.
20  Q.   Do you recall an issue of a dispute
21 between Jest and OPI that orders had been
22 canceled?
23  A.   There was in June or July a
24 modification of the purchase orders, in which
25 they were restated, in which she sent Mr. Reaser

Page 73

1 an e-mail stating that these are the blinds that
2 are to be made, and there were -- these are the
3 blinds that are to be made, and she asked him to
4 confirm and he confirmed.
5   Q.   This is an e-mail between Kerry and
6 Dan?
7   A.   June 18th.
8   Q.   And it's confirming what?
9   A.   She sent to Mr. Reaser an e-mail
10 saying these are the blinds by number for
11 Walmart, these are the blinds for others that
12 will be produced, sent the e-mail to Mr. Reaser
13 asking him to confirm, and then I believe she
14 sent him a follow-up one asking him to confirm
15 again, and he did at that time.
16  Q.   And I'm trying to tie that to
17 cancellation. Are you saying that your belief
18 is that -- or OPI's belief is that that modified
19 the total number or something?
20  A.   Yes, it did.
21  Q.   Flip to the second page of Exhibit
22 16. The top part is an e-mail from Dan to
23 yourself and Shannon Reaser.
24       Do you see that?
25  A.   Yes.

19 (Pages 70 - 73)