## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| OUTDOOR PRODUCT INNOVATIONS, INC. | ) CASE NO. 1:18-CV-02457-PAG |
| | ) |
| | ) JUDGE PATRICIA A. GAUGHAN |
| Plaintiff, | ) |
| | ) **MEMORANDUM IN SUPPORT OF** |
| v. | ) **PLAINTIFF'S MOTION TO STRIKE** |
| | ) **AFFIDAVITS OF KERRY** |
| JEST TEXTILES, INC., | ) **FORSDAHL AND DOUG GRAVES** |
| | ) |
| Defendants. | ) |

**I.    STATEMENT OF CASE**

Defendant Jest Textiles, Inc. ("Defendant" or "Jest") filed its Motion for Summary Judgment on November 15, 2019. In an effort to manufacture a genuine issue of material fact, Jest attached the affidavits of Kerry Forsdahl and Doug Graves. Because the Forsdahl Affidavit directly contradicts prior sworn testimony, it should be stricken. Because the Graves Affidavit relies upon and attempts to authenticate an inauthentic document, it too should be stricken.

**II.   LAW AND ARGUMENT**

It is well settled that a "party may not create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts her earlier deposition testimony." *Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir. 1986). When faced with a request to strike a postdeposition affidavit, this Court "must first determine whether the affidavit directly contradicts the nonmoving party's prior sworn testimony." *Aerel, S.R.L., v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 908 (6th Cir. 2006). If such a contradiction is found, this Court must strike the affidavit "unless the party opposing summary judgment provides a persuasive justification for the contradiction." *Id.*; *Radzanowski v. Principal Fin. Grp.*, No. 1:11 CV 463, 2012 U.S. Dist. LEXIS 38148, at *11 (N.D. Ohio Mar. 21, 2012).

### A. Kerry Forsdahl

The Forsdahl Affidavit is directly contradicted by her deposition testimony in the following substantial ways.

For example, Paragraph 4 of the Forsdahl Affidavit falsely states:

4. Plaintiff issued signed C.I.F. purchase orders to Jest in the amount of $5,999,933.30. These orders were all signed by OPI's controller Samantha Hamilton. True and accurate copy of the P.O.'s is attached hereto as Exhibit "2." All Plaintiff's signed P.O.s stated that the sale and shipment terms were C.I.F. (meaning cost, insurance and freight to ship from China). The purchase orders contained no second page. The total amount of billings then increased to $6,204,269.35 based on changes to the orders.

However, Ms. Forsdahl testified, at Vol. I, page 36 of her deposition, that the OPI POs which were hand delivered on May 17th and contained the letters superseded and replaced the prior emails received from OPI:

> Q. And those were the purchase orders that had the letters at the end?
>
> A. Correct, yes.
>
> Q. And if I'm understanding this correctly, there were purchase orders issued prior to the purchase orders that were hand-delivered to you at this May meeting?
>
> A. Yes.
>
> Q. If I told you it was May 17th, would that sound right?
>
> A. That sounds right, yes.
>
> Q. Was it your understanding that the purchase orders that were hand-delivered to you at this May 17th meeting were superseding and replacing the purchase orders that were delivered to you prior to the May 17th meeting?
>
> A. Yes.
>
> (Thereupon, Plaintiff's Exhibit 3, OPI ·000066-084, OPI April/May 2018 purchase ·orders, was marked for purposes of identification.)

Ms. Forsdahl also testified, at Vol. I, pages 49-53, that the OPI POs did in fact contain the second page terms and conditions:

> Q. When you received the purchase orders on May 17th, were the terms and conditions of those purchase orders attached to the back side of the document?
>
> A. I believe so but that was the first time I ever saw that really. Their initial -- the POs I ever received from OPI before this order were just single sided just, they looked just like this and that was it.· It was only when I received these purchase orders after the fact of being half, you know, halfway through production on these orders that then they sent through purchase orders that had this legalese on the back.
>
> Q. But you recall receiving the legalese on the back at the May 17th meeting?
>
> A. Correct.
>
> Q. Did you read through the legalese?
>
> A. Yes.
>
> Q. Did you agree to the legalese?
>
> A. No.
>
> Q. Did you tell Dan we can't accept this purchase order or these purchase orders based on the legalese on the back side?
>
> A. No.

In fact, the POs' received from Samantha Hamilton also contained the second page terms and conditions. Ms. Forsdahl testified, at Vol. I, page 51-52:

> Q. Handing you what I have marked as Plaintiff's Exhibit 6 and I know we're sort of bouncing around a little bit time-wise so, you know, I will apologize for that but this, these appear to be signed purchase orders that Samantha sent to you on or about April 23rd, 2018. Can you take a second and confirm that that is in fact the case?
>
> A. Yes, it appears to be.
>
> Q. And attached to each one of these purchase orders you have the terms and conditions that we spoke of earlier, correct?
>
> A. Yes.

Q. And it also has "delivery date required" for each purchase order, correct?

A. Yes.

Q. After you received these purchase orders, we talked about the May 17th meeting where you had additional or other purchase orders that superseded and replaced the purchase orders that were previously provided, correct?

A. Yes.

Q. So the purchase orders that are included in this April 23rd email were in fact superseded by the other purchase orders?

A. Yes.

The last sentence of paragraph 4 then shifts from purchase orders to billings. The Forsdahl Affidavit then makes the grossly misleading statement that "the total amount of Billings then increased to $6,204,269.35 based on changes to the orders". "Billings" are not the same as orders. In the November 8, 2019 deposition of Ms. Forsdahl, she was asked about a Jest Internal Report of Sales to OPI for the period January 1, 2018 through August 5, 2019. Ms. Forsdahl testified, at Vol. 2, page 16 of her deposition, as to the distinction between total billings and billings for product.

Q. What is the gross volume?

A. The gross is the total number. Total dollar amount.

Q. What is that number?

A. Six million one hundred -- $6,130,054.61.

Q. You've got a breakdown by models. And it says, "non-factored" and "direct". What are those numbers? If you would read those two numbers, and what do they mean?

A. Yes. The non-factored number is $5,689,432.30. And the direct number is $440,622.31. These numbers are – we use difference classifications to help breakout different types of charges in our system. So non-factored, we would use a designation for product.

By Forsdahl's own testimony, Jest only "billed" $5,689,432.20 for product (Hunting Blinds), and the remainder of the internal billings were expenses incurred by Jest which Jest was wrongfully attempting to collect from OPI. The implication of the Forsdahl Affidavit is that Jest contemporaneously billed OPI for $6,204,269.35. That lie was revealed in her deposition. Jest was changing its internal billing numbers even as late as August 2019 in the middle of producing documents pursuant to Discovery.

Ms. Forsdahl further testified, at Vol. II, page 18 of her deposition, that billings are not the same as purchase orders.

> Q. So looking at this total of purchase orders in the Jest computer system of $6,130,000, do you have purchase orders from OPI for that amount of $6,130,000?
>
> A. We received purchase order from OPI for $5,900,000.
>
> Q. Do you have purchase orders from OPI for these non-product charges that add up to $440,622?
>
> A. Those aren't purchases. We wouldn't receive a purchase order for something that's not a purchase. These are charges for freight, storage, services, things that were incurred. They're not purchase orders. They're not items that people purchased.

Ms. Forsdahl further testified, at Vol. II, page 19 of her deposition, that she has no written authorization from OPI to incur and bill OPI for extra expenses for freight and storage.

> Q. Do you have anything in writing from OPI to Jest that says, "We authorize you to incur these other expenses on our behalf, and you can bill them to us?"
>
>     MR. STAVNICKY: Same objection.
>
> Go ahead, Kerry.
>
> A. Everything was over the phone. Dan never put anything in writing. He was very careful about that.
>
> Q. What is the last date – can you recall the last date that you received any purchase orders from OPI?

A. The last date that I have in my mind that I received purchase orders from OPI would be May – the – May 17, 2018.

In her Deposition Testimony at Vol. 2, page 44, Ms. Forsdahl admitted that she directed her staff to stop e-mailing invoices to OPI after December 4, 2018, even though Jest was creating new invoices in their internal system.

Q. Yeah, I just heard what you said. But explain to me, looking at Exhibit 8, the last invoice that Maryann sent, which was after litigation started on December 4, 2018. It's invoice 61474. But when I look at the stack of invoices, they run through number 61511.

A. Yes, because we were getting expenses, shipping, freight, storage, whatever. So I had her continually generate the invoices that pertained to this matter. But I wasn't going to have her e-mailing them directly when there were lawyers involved. So no. We generated it in our system and presented it as part of our discovery.

Another contradiction lies in Paragraph 15 of the Forsdahl Affidavit where she falsely states that OPI did not pay in full for the subject goods.

15. Plaintiff only paid Jest $5,705,527.31 against $6,204,269.23 of Jest bills (not including duty charges, VAT, interest and attorneys' fees). *See* Account statement attached hereto as Exhibit "3".

Per Ms. Forsdahl's deposition at Vol. 2, page 16, she identified that Jest's billings for product was $5,689,432. The total billings for product are less than the $5,705,527.31 which Jest has credited OPI for paying. The balance of amounts "billed" were invoices for freight and storage costs. As noted above, Jest did not even send all bills to OPI in the regular course of business but introduced them only in discovery in order to improve the optics of their position. Furthermore, Jest knowingly and with malice fails to credit OPI for the payment of $224,675 made by OPI against invoices billed by C&H Logistics to Jest and included in the Jest billing totals they claim are unpaid. The payment by OPI of Jest's liabilities to C&H is documented on Exhibit __.

Ms. Forsdahl was asked about the C&H Logistics $224,675 Payment Demand letter in her deposition, at Vol. II, page 55.

> Q. Do you recall received Exhibit 13 from C&H on February 28, 2019?
>
> A. Yes.
>
> Q. What is this letter?
>
> A. A demand for payment.
>
> Q. How much?
>
> A. $224,675.
>
> Q. Did Jest pay this, these invoices to C&H?
>
> A. No.

Because the Forsdahl Affidavit directly contradicts her prior deposition testimony in substantial and material ways, the entire affidavit should be stricken. This is so because the balance of her affidavit (which ignores the offer set forth in the Phase III POs hand delivered on May 17th and acceptance of those Phase III POs by issuance of the pro forma invoices) then refers to Jest "invoices" as being part and parcel of the parties' "contract." *See* Forsdahl Affidavit ¶s 5, 9-10. As explained in the Opposition to Jest's Motion for Summary Judgment, Jest's invoices are not part of the parties' contract. The parties' contract was formed when OPI issued the Phase III POs and hand delivered those POs to Kerry Forsdahl and when those Phase III POs were accepted by Jest through the issuance of the pro forma invoices. Jest is on record admitting that 1) the Phase III POs were hand delivered to Ms. Forsdahl on May 17th, 2) those POs contained the terms and conditions, 3) the prior POs contained the terms and conditions, and 4) that Jest accepted the Phase III POs by issuing the pro forma invoices.

The Forsdahl Affidavit directly contradicts those admissions and should be stricken.

**B. Doug Graves**

The Graves Affidavit should be stricken as well. The Graves Affidavit contains many conclusions of law rather than facts. Mr. Graves testified he only has a high school education and no specialty certifications and that he was not involved in negotiation of the contract with OPI nor with the finances of Jest. More critically, the Graves Affidavit contains inadmissible, hearsay testimony and attempts to authenticate inadmissible hearsay records and documentation. Specifically, the Grave Affidavit provides:

> 10. Due to Plaintiff's non-payment and late payments, a VAT tax rebate in China was lost.
>
> 11. Due to Plaintiff's non-payment and late payment, a VAT tax penalty of 100% was assessed in May 2019.
>
> 12. Jest's Chinese manufacturers and suppliers are demanding that Jest pay these VAT amounts to them through the government entity Shanghai Decorators. A true and accurate copy of the Chinese demand and assessment of these VAT taxes and penalties is attached hereto as Exhibit "20"
>
> 13. Shanghai Decorators is a Chinese Government company and the assessment attached hereto is an official government document stamped by the Chinese government.
>
> 14. Plaintiff has not paid Jest or any third party for the VAT or VAT penalty.
>
> 15. Plaintiff owes Jest $472,770,10 for VAT taxes and another $472,770.10 for the VAT penalty.
>
> 16. The documents attached hereto are true and accurate and were acquired during the course of regularly-conducted business activity of Jest.

Exhibit 20 purports to be a communication from Shanghai Decorators ("SDC") to Doug Graves. Exhibit 20 further attaches a purported summary of invoices, payments and VAT, of some sort or another. Exhibit 20 is inadmissible.

First, Exhibit 20 is not as claimed a "Chinese demand and assessment of these VAT taxes and penalties." Exhibit 20 is correspondence and a summary chart, neither of which are properly authenticated.

Federal Rule of Evidence 901 requires authentication of all exhibits in order " to support a finding that the item is what the proponent [of the evidence] claims it is." Fed.R.Evid. 901(a). Therefore, "the standard for authentication, and hence for admissibility, is one of reasonable likelihood." *United States v. Holmquist,* 36 F.3d 154, 168 (1st Cir.1994) (holding also that " reasonable likelihood" does not require " the proponent of the evidence to rule out all possibilities inconsistent with authenticity" ). Rule 901(b)(4) explicitly permits the consideration of an exhibit's "appearance, contents, substance, internal patterns, or other characteristics of the item, taken together with all the circumstances." Fed.R.Evid. 901(b)(4).

Federal Rule of Evidence 902(3) provides that a foreign public document is self-authenticating when it "purports to be signed or attested by a person who is authorized by a foreign country's law to do so. The document must be accompanied by a final certification that certifies the genuineness of the signature and official position of the signer or attester - or of any foreign official whose certificate of genuineness relates to the signature or attestation or is in a chain of certificates of genuineness relating to the signature or attestation." Fed.R.Evid. 902(3). Further, the Rule provides: "If all parties have been given a reasonable opportunity to investigate the document's authenticity and accuracy, the court may, for good cause, either: (A) order that it be treated as presumptively authentic without final certification; or (B) allow it to be evidenced by an attested summary with or without final certification." Fed.R.Evid. 902(3)(A)-(B).

Federal Rule of Civil Procedure 44(a)(2)(A)(ii) evidences a foreign official record that is admissible if the record or copy "is attested by an authorized person and is accompanied either by

9

final certification or by a certification under a treaty or convention to which the United States and the country where the record is located are parties." Further, it provides if reasonable opportunity has been given to all parties to investigate the authenticity and accuracy of the attested documents, the court may, for good cause shown, (i) admit an attested copy without final certification…" Fed.R.Civ.P. 44(a)(2)(A)(ii).

Exhibit 20 does not contain "a final certification that certifies the genuineness of the signature and official position of the signer or attester — or of any foreign official whose certificate of genuineness relates to the signature or attestation or is in a chain of certificates of genuineness relating to the signature or attestation."

The stamp contained at two locations on Exhibit 20 provides no representation or any indication whatsoever that it is a "final certification" or any certification of the genuineness of the signature and official position of the signer. Instead, the stamp is nothing more than a nondescript stamp:



Without final certification (or any certification for that matter), the document is inadmissible. *See United States v. DeJongh,* 937 F.2d 1, 4 ("Where a rule prescribes specific conditions for authenticating a public document, and the document's proponent fails to comply with the specified conditions, the proffer should ordinarily be rejected."); *cf. Lloyd v. Am. Exp.*

*Lines, Inc.,* 580 F.2d 1179, 1188 n.19 (3d Cir. 1978) ("Inasmuch as the record of the Japanese proceeding was exemplified by a secretary of the Yokohama District Public Prosecutor's Office, and transmitted under seal of the Consul of the United States, we note that the requirements for self-authentication of foreign public documents of Fed.R.Evid. 902(3) are met."). There is no proof that Alex Hua is indeed who he claims to be or that, as such, he is in a position to attest to a document of Shanghai Textiles Decorations . *See United States v. Squillacote,* 221 F.3d 542, 562 (4th Cir. 2000) ("An examination of Rule 44(a)(2) and Rule 902(3) reveals two requirements for the authentication of a foreign document. First, there must be some indication that the *document* is what it purports to be.... Second, there must be some indication that the *official* vouching for the document is who he purports to be." (emphasis in original)).

Nor is the document admissible under the savings clauses which permits admissibility of an attested foreign document lacking final certification "for good cause" if "all parties have had a reasonable opportunity to investigate [its] authenticity and accuracy." Fed.R.Civ.P. 44(a)(2)(C); *see also DeJongh,* 937 F.2d at 4.

In the present case, there is absolutely no certification or attestation on this purported foreign document. Good cause cannot be shown.

In addition, the communication contains inadmissible hearsay including the below statements:

> Today is May 15,2019 which time past 2 months again, the issue of payment remains unresolved, our company face big trouble because not receive your payment and mill VAT invoice both.
>
> As of March 15, the following marked in RED can not be applied for Tax Refund loss 16%-----Total loss USD$2,954,813.14*16%=USD$472,770.10. And on June 15, an additional penalty of 16% will also be done on all marked in RED.-----Additional loss USD$2,954,813.14*16%=USD$472,770.10.
>
> So the time is very tight.
> Please push your buyer and arrange all payment asap.
> Thanks for your cooperation.

Setting aside the absurdity of the statements (in which an alleged representative of a purported Chinese governmental entity such as SDC could "face big trouble because not receive your payment and mill VAT invoice both"), these statements are clearly offered to prove the truth of the matters asserted. Evid. R. 801 and 802 precludes admissibility of these statements. Moreover, there are no exceptions available under Evid. R. 803 or Evid. R. 804 and no apparent attempt to invoke an exception is made by Mr. Graves. The purported letter is clearly not a Jest business record under Evid. R. 803(6). Nor is it a public record under Evid. R. 803(8) since it does not set out the offices activities, matters observed while under a legal duty to report.

OPI expects Jest to argue that Hua's letter constitutes a business record and would thus fall under the hearsay exception in Fed. R. Evid. 803(6). Jest would be wrong to do so.

A record of an act is exempt from the hearsay rule if

    (A)   the record was made at or near the time by—or from information transmitted by—someone with knowledge;
    (B)   the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;
    (C)   making the record was a regular practice of that activity;
    (D)   all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification

>> that complies with Rule 902(11) or (12) or with a statute permitting certification; and
> (E) the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

Fed. R. Evid. 803(6). Jest will be unable to meet any of the foundational elements of Rule 803(6) to admit Hua's letter under the business records exception because Hua's letter is not Jest's business record. *See United States v. Gwathney*, 465 F.3d 1133, 1141 (10th Cir. 2006) ("[T]he DEA cannot claim Western Union's response as one of its *own* business records for the simple reason the DEA did not prepare the document.") (emphasis in original).

The Graves Affidavit claiming that Plaintiff owes Jest for unpaid VAT taxes and unpaid VA penalties is also directly contradicted by the testimony of Mr. Graves at Vol. 1, page 61, wherein Mr. Graves clearly states that Jest has no legal affiliates in China, is not registered for VAT in China, and that it would be illegal under Chinese law for Jest to be involved in VAT or claims for VAT refunds.

> Q. Okay. So, does Jest have ownership in any Chinese factories?
>
> A. It's against the law; no, we don't.
>
> Q. Okay. Do you have ownership in any shipping companies in China?
>
> A. No, we don't; it's against the law.
>
> Q. Okay, Do you have ownership in, I'll call it service businesses, like Shanghai Textile Decorating Group, Corp.?
>
> A. No, we don't; it's against the law.
>
> Q. Okay, Okay. Are you – is the Jest office there in China registered for VAT in China?
>
> A. No, we're not.
>
> Q. Okay.
>
> A. We cannot buy and sell in China; therefore, we cannot deal with VAT invoices.

13

Q. Okay. So you wouldn't do any registration, any filing of returns, any claims for refunds? None of that processing could be done by the Jest China office?

A. Absolutely not.

Q. Okay. And I'm assuming that you've never attempted to file any claim for a VAT refund related to the 2018 Rhino orders?

A. It's against the law.

Exhibit 20 must be stricken from the record along with the Graves Affidavit which attempts to introduce it and explain it.

### III. CONCLUSION

Based on the foregoing, this Court should strike from the record the Forsdahl Affidavit and the Graves Affidavit.

Dated: December 16, 2019

Respectfully submitted,

*/s/ David M. Cuppage*
David M. Cuppage (0047104)
E. Roger Stewart (0069042)
Nicholas R. Oleski (0095808)
MCCARTHY, LEBIT, CRYSTAL
 & LIFFMAN CO., LPA
101 W. Prospect Avenue, Suite 1800
Cleveland, Ohio 44115-1088
Telephone: (216) 696-1422
Facsimile: (216) 696-1210
Email: dmc@mccarthylebit.com
ers@mccarthylebit.com
nro@mccarthylebit.com

*Attorneys for Plaintiff Outdoor Product Innovations, Inc.*

01390466

14