**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**


| | | |
|---|---|---|
| Outdoor Products Innovation, Inc., | ) | CASE NO. 1:18 CV 2457 |
| | ) | |
| Plaintiff, | ) | JUDGE PATRICIA A. GAUGHAN |
| | ) | |
| Vs. | ) | |
| | ) | |
| Jest Textiles, Inc., | ) | <u>Memorandum of Opinion and Order</u> |
| | ) | |
| Defendant. | ) | |


<u>INTRODUCTION</u>

This matter is before the Court upon the parties' cross-motions for summary judgment

(Docs. 101 and 110). This is a breach of contract action. For the reasons that follow,

defendant's motion (Doc. 101) is GRANTED in PART and DENIED in PART and plaintiff's

motion is also (Doc. 110) is GRANTED in PART and DENIED in PART. Defendant is entitled

to summary judgment with respect to counts two, three, four, and five of the complaint. Count

one, however, remains pending. Plaintiff is entitled to summary judgment with respect to count

one of the counterclaim to the extent it seeks recovery for unpaid product and VAT. Count one

of the counterclaim remains pending in all other respects, and count two of the counterclaim remains pending. Plaintiff is entitled to summary judgment with respect to count three of the counterclaim and count four of the counterclaim is DISMISSED as MOOT.

## **FACTS**

Defendant is a custom manufacturer of durable fabrics. Defendant's principal place of business is in New Jersey, although defendant maintains a satellite office in China. Defendant does not manufacture specific products itself. Rather, it locates a manufacturer and supplies its fabric to that manufacturer to produce whatever product is requested by the buyer. In this case, plaintiff ordered custom hunting blinds, known as "Rhino Blinds," from defendant. Defendant, in turn, contracted with Chinese manufacturers to produce the product.

The parties began negotiations in the fall of 2017. (Forsdahl dep. at 93). On October 17, 2017, defendant asked plaintiff whether it wanted the price to include any duty charge. Specifically, defendant inquired of plaintiff, "LDP[1] delivered to your door? Or Just CIF to port? Most factories would never quote with duty, but I want to be sure." Plaintiff responded, "Just to port." (Doc. 104-5, email).

Beginning in January 2018, plaintiff advanced money to defendant as a "deposit" to be credited against future orders. (Reaser Decl. ¶ 3). According to plaintiff, the deposits were intended to provide defendant with the ability to line up production sources. (Id.) In addition, plaintiff sent representatives to China to understand the manufacturing process. (Doc. 104-19, Graves Decl. at 3).

---

[1] "LDP" appears to be a term of art in the shipping industry meaning "landed duty paid."

2

In April of 2018, plaintiff issued three purchase orders identified as "1128," "1132," and "1133." ("April Purchase Orders"). The total number of Rhino Blinds ordered at this time equaled 4,742. Subsequently, on May 17, 2018, the April Purchase Orders were replaced and superseded by a series of 17 purchase orders ("May 17th Purchase Orders" or "Purchase Orders"). (Forsdahl Dep. at 36:18). Plaintiff hand delivered the Purchase Orders to defendant. (Forsdahl Dep. at p. 36). It appears that there may be some dispute as to whether the terms of the April Purchase Orders are identical to the terms of the Purchase Orders. The Purchase Orders appear on one physical piece of paper each, but each contains two sides of printed language. (Forsdahl Dep. at 49-50)[2]. Unlike the April Purchase Orders, the Purchase Orders identified three different types of "coding."

The Purchase Orders called for the production of 158,010 hunting blinds. (Levis Report, Doc. 109-1). Although neither party provides evidence as to the precise cause, it appears that ultimately the parties agreed that the total number of hunting blinds to be produced totaled 155,558. (Doc. 110-1 at p. 13; Doc. 112 at p.1)

The Purchase Orders provide specific delivery dates for separate shipments of the hunting blinds. In addition, the Purchase Orders are denoted as "CIF Cleveland." The term "CIF Cleveland" means that the cost of insurance and freight to the point of destination, which is

---

[2]      By separate Order, the Court struck that portion of Forsdahl's declaration in which she averred that *all* purchase orders contained only one page. The purchase orders that Frosdahl attaches to her declaration and purports to authenticate contain only the front side of the invoices. But, her testimony that the Purchase Orders superseded previous orders and her acknowledgment at her deposition that the Purchase Orders contained a back side is directly contradictory to the statement she now submits in her declaration.

Cleveland, will be borne by defendant. (Forsdahl Dep. at 185-86). The Purchase Orders contained other terms directed at delivery dates, delay, and plaintiff's termination rights based on delivery delays. In addition, the Purchase Orders provide that "by acceptance of this Purchase Order, [defendant] accepts the terms and conditions stated above." Defendant indicates that, although it read these terms, it did not accept them. (Forsdahl Dep. at 50). Nonetheless, defendant did not notify plaintiff that it was not accepting the Purchase Orders. (Id.)

In response to the Purchase Orders, plaintiff requested that defendant issue proforma invoices. Defendant did so. The proforma invoices contain a description, unit quantity, and price for each order of hunting blinds. In addition, at the bottom is a notation marked "CUST REQ BY" as well as a date. The bottom of each proforma invoice also contains a notation "TERMS 50% DEP/50% CBS." Based on the parties' arguments, the Court understands this to mean that defendant expected a deposit payment of 50% for each of the Purchase Orders, with the remaining 50% payment due at a later date.[3] These invoices also provide that, in the event timely payment is not made, interest at the rate of 1.5% per month, as well as attorneys' fees, must be paid by plaintiff. Neither the Purchase Orders nor the proforma invoices expressly address who is to pay any duty charges in the event such charges are levied by U.S. Customs.

At some point in time, the parties discussed a different want to allocate deposits:

In addition, as suggested by [defendant], [plaintiff] and [defendant] discussed a better way to allocate deposits and payments. It was thereafter agreed that on each invoice submitted by [defendant] to [plaintiff], [plaintiff] would apply 10% of each invoice against the deposits and pay the additional 90% of each invoice once it was confirmed that the blinds were four days away from the final destination, i.e. Cleveland, Ohio. It was

---

[3]     The Court notes that there are 17 purchase orders, but only 16 proforma invoices. Neither party raises any issue with respect to the discrepancy.

4

further agreed between [defendant] and [plaintiff] that once fifty percent (50%) of the
total orders had been delivered and paid for that the allocation formula for the Deposits
would change such that 50% of the delivered costs would be allocated against the
Deposits and the remaining 50% of the invoiced amount would then be due.

(Levis Report at 6-7; Levis Decl. at Par. 3). In addition, in an email from plaintiff to defendant,

plaintiff indicated that "You will, going forward as agreed, Receive money only when containers

hit the water and then 75% will be paid as we have already paid 25%." (Doc. 113-2, email (at

very top of page)). It appears undisputed that at no point did plaintiff pay a 50% deposit.[4]

Ultimately, defendant issued invoices for payment to plaintiff. Those invoices note that

defendant credited 10% of the amount due and payable to the deposit made by plaintiff. As a

result of the credit, the remaining 90% of the face value of the invoice was due to be paid. (Doc.

109-2 at PageID 3589).

By May 18, 2018, plaintiff had paid defendant $1 million in deposits. (Reaser Decl. ¶ 3).

On June 14, 2018 and June 21, 2018, plaintiff made additional deposits of $200,000 each

bringing the total amount of deposits made to $1.4 million.

According to defendant, plaintiff initially paid the assessed duty. (Forsdahl Decl. ¶ 17).

At some point, an issue about the payment of duty charges arose. (Forsdahl Dep. pp 183-84).

Defendant explained to plaintiff that it quoted the prices without duty. (Id.) Plaintiff objected,

arguing that the price was quoted as "CIF." (Id.) Defendant explained to plaintiff that a"CIF"

quote does not include duty. (Id.) Plaintiff indicated that if the prices do not include duty costs,

then it wanted to cancel the orders. (Id. at 186.) Defendant responded that plaintiff should

---

[4]     Defendant's briefing contains a number of assertions with no
        corresponding citation to any evidence. Unsupported factual
        assertions are not admissible and, therefore, no reference to any
        such statement is set forth in this Opinion.

cancel the orders. It is undisputed that plaintiff never canceled the orders due to the payment of

duty charges.[5] Rather, it appears that plaintiff requested that defendant attempt to reclassify the

goods by entering a code with U.S. Customs that the goods were "zero duty." (Id. at 186-87).

Defendant did so, but, by August or September, defendant received a notice from U.S. Customs

indicating that an investigation had been opened. (Id.) It is undisputed that the United States

government eventually assessed defendant with duty charges for the importation of the blinds at

issue. Neither plaintiff nor defendant appealed the reclassification of the blinds and the duty

assessed. Further, it appears undisputed that plaintiff did not remit any monies to defendant for

duty costs. The total outstanding duty amounts to $488,622.66.[6] (Forsdahl Decl. ¶ 20)

Although the parties agree that defendant has now delivered all of the Rhino Blinds at

issue,[7] deliveries were not timely made. (Reaser Decl. ¶¶ 7, 10). According to defendant, the

delivery dates on the Purchase Orders were not guaranteed delivery dates. Rather, they were

dates requested by plaintiff. (Forsdahl Dep. at 40-41; 44). Defendant notes that it would have

been obvious that the dates were not guaranteed. For example, one of the Purchase Orders

provided on May 17th, requests delivery on July 1st. But, it takes 30 days to ship a product from

China and there is a 20-week lead time for production. (Id.) According to defendant, plaintiff

---

[5] Plaintiff's President avers that plaintiff canceled "numerous" orders in August and September of 2018 due to missed delivery dates. (Doc. 110-2, Reaser Decl. ¶¶ 12-13). It is not clear to the Court what effect these "canceled" orders had on the 155,558 total blinds delivered.

[6] It is not clear whether this amount includes the amounts that defendant claims plaintiff initially paid.

[7] See, Doc. 115 at PageID 4669 ("To be sure, [plaintiff] agrees that it has received all of the blinds at issue....")

knew of the lead time. (Id. at 40). Plaintiff notes, however, that in an internal email of May 5, 2018, defendant indicated that "it cannot get behind" on delivery and that plaintiff wants a "clear promise" on ship dates. This email was sent prior to the Purchase Orders.

In addition, it appears that prior to the Purchase Orders, certain hunting blinds had already arrived in the United States. According to plaintiff, in April of 2018, it received an invoice from defendant for inland freight truck charges from California to Cleveland. (Doc. 110-2 at Par. 5). The parties had agreed that the goods should be shipped to the ports on the west coast and then sent via train to Cleveland. Subsequently, as of June 21, 2018, plaintiff instructed defendant to truck all of the blinds from California to Cleveland. (Doc. 104-7). It appears undisputed that defendant bore the cost of the train freight. (Doc. 112 at 14 ("In this case, [defendant] agreed its price included all ocean freight and [defendant] even added in the rail shipping as well.")). The parties dispute, however, who bore the costs of trucking the blinds. According to defendant, the parties agreed that plaintiff would bear these costs. In support of its position, defendant cites a text exchange that appears to discuss the pricing options of trucking the materials, along with a credit defendant intended to provide for the cost plaintiff would have incurred for train freight. (Doc. 112 Ex. 6). On the other hand, plaintiff claims that it allowed defendant to ship by truck because it was faster and defendant was behind schedule. Plaintiff's president testified that plaintiff never agreed to pay for extra transportation costs. (Doc. 119-10, Reaser Decl. at ¶ 8). Plaintiff acknowledges, however, that it informed defendant that it would "help [defendant] financially" and that the parties would "settle up" any additional costs associated with delayed deliveries after plaintiff received all of the hunting blinds. (Id.)

Subsequently, defendant began sending invoices to plaintiff for transportation costs in

excess of $100,000. (Levis Report at 10). In addition, defendant invoiced plaintiff for a total of $494,584.75. (Id.) According to defendant, this amount did not reflect a credit for deposits plaintiff made. (Id.) No supporting documentation accompanied the invoices. (Id.) In October of 2018, plaintiff informed defendant that it would not pay the invoices without supporting documentation. (Id.) According to plaintiff, no supporting documentation was ever provided. Defendant then issued a "revised" statement showing that the only remaining amounts owed by plaintiff were the disputed amounts for the transportation costs. (Id.) As a result of the remaining outstanding amounts, defendant withheld shipment of the blinds. These goods were housed in warehouses in both Cleveland and California. (Id.) According to defendant, in incurred storage costs due to the late payments made by plaintiff.

As of October of 2018, defendant's delivery of hunting blinds totaled 120,135.

Thereafter, plaintiff filed suit in state court against defendant for breach of contract. Defendant removed this matter to federal court. At this pont, it appears that defendant held 33,710 of undelivered hunting blinds in warehouses in either Cleveland or California. Of this number, 10,404 blinds were located in Cleveland, 8,943 blinds were located in a warehouse in California, and the remaining 14,363 blinds were held in California by C&H Logistics, Inc. The Cleveland blinds and the 8,943 blinds located in one of the California warehouses were the subject of a partial settlement agreement reached in this lawsuit. Plaintiff paid defendant a sum certain. In exchange, defendant released the blinds held in Cleveland to plaintiff at plaintiff's expense. In addition, defendant arranged for the transport of the 8,943 blinds held in California.

Plaintiff agreed to pay the shipping costs for the California blinds, to be capped at $35,000.[8] As a result of the partial settlement, the only undelivered blinds consisted of the 14,363 blinds held by C&H Logistics.

On March 22, 2019, plaintiff entered into an agreement with C&H Logistics. Pursuant to the agreement, plaintiff purchased C&H's lien rights against defendant, as well as transaction documents. In exchange, plaintiff paid C&H Logistics $237,614.47. In addition, some of the blinds were subject to encumbrance by a Chinese Manufacturer in the amount of $43,816.15. Plaintiff agreed to pay this amount to C&H, who in turn agreed to remit the funds to the Chinese manufacturer. Plaintiff then paid $43,816.15 to C&H Logistics. According to plaintiff, C&H Logistics ultimately remitted the $43,816.15 to defendant.[9]

It appears that the Chinese government assessed the Chinese manufacturers and suppliers with a value added tax ("VAT") in the amount of $472,770.10. According to defendant, a substantial rebate exists with respect to VAT and is available if goods are exported outside of

---

[8] In its motion, plaintiff outlines "additional costs to ship the Cleveland and California blinds to Ohio." It is not clear to the Court whether these "additional" costs are "in addition" to the costs contemplated by the parties' original agreement, or whether they are "in addition" to the payments contemplated by the partial settlement agreement.

[9] The document plaintiff cites shows two notations on defendant's Transaction Detail List. One entry is "4/1/19 Subtotal $43,142." The other amount noted appears to be for $674.15 and a corresponding invoice number is referenced. According to plaintiff, the total of these two notations is $43,816.15, which is the payment from C&H Logistics to defendant. Although plaintiff cites no testimony about these numbers or whether they are, in fact, a payment made by C&H Logistics, defendant offers no opposition on this point.

China, provided timely payment is made for the goods purchased. (Doc. 104-19, Graves Decl. at ¶ 10[10]). According to defendant, because plaintiff did not timely pay for the hunting blinds, no rebate was sought for the VAT and the initial VAT remained unpaid. (Doc. 104-19, Graves Decl. at ¶ 10[11]). In May of 2019, the Chinese government assessed a 100% penalty on the VAT, brining the total amount of VAT outstanding to $945,540.20. (Doc. 104-19, Graves Decl. at ¶¶ 11, 15).

Plaintiff and defendant are in agreement that plaintiff has now received all of the blinds at issue, which totals 155,558.[12] Defendant indicated that the cost of these blinds (not including items such as freight or storage) totaled $5,689,432.30. (Doc. 107-1, Forsdahl Dep. II at 16). Defendant acknowledges that plaintiff has paid a total of $5,705,527.31. (Id. at 21-24)(acknowledging receipt of $3,935,279.91, $1,750,674.15, and $19,573.25).

The amended complaint contains five claims for relief. Count one is a claim for breach of contract. Count two is a claim for specific performance. Count three asserts a claim for breach of the parties' non-disclosure and non compete agreements. Counts four and five are claims for conversion and unfair competition, respectively.[13] In its brief in opposition to

---

[10]    The cited declaration contains two paragraphs numbered "10." This citation is to the first "paragraph 10."

[11]    The cited declaration contains two paragraphs numbered "10." This citation is to the second "paragraph 10."

[12]    This number does not correspond to the number of blinds on the invoices. The parties, however, do not dispute that this is the total number of blinds at issue.

[13]    Although defendant purports to move on "count six," which it asserts is a claim for "injunctive relief," no such claim exists in the amended complaint.

defendant's motion for summary judgment, plaintiff concedes count two (specific performance), count four (conversion), and count five (unfair competition). Accordingly, defendant is entitled to summary judgment with respect to these three claims. As such, the only remaining claims in the amended complaint are counts one and three.

Defendant asserted a counterclaim containing four claims for relief. Count one is a claim for breach of "purchase orders." Count two seeks an accounting. Count three is a claim for fraud and count four seeks the right to resell and liquidate the hunting blinds held in storage. It further seeks all rights and remedies under the Uniform Commercial Code ("UCC"). Subsequently, defendant sought leave to "supplement" the counterclaim. The Court granted the motion to the extent defendant sought to add allegations regarding the incurrence of VAT and duty charges. The Court, however, denied the motion with respect to defendants' request to add allegations regarding plaintiff's alleged breach of the parties' confidentiality, non-disclosure, and non-compete agreements. In addition, defendant sought leave to amend its fraud claim based on an email plaintiff's president sent concerning the availability of funds in its bank. The Court denied that request as well.

The parties cross-move for summary judgment and each opposes the other's motion. The Court will address the parties' arguments in turn.

**STANDARD OF REVIEW**

Summary Judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (citing Fed. R. Civ. P. 56(c)); *see also LaPointe v. UAW, Local 600*, 8 F.3d 376, 378 (6th Cir. 1993). The burden of showing the absence of any such genuine issues of material

facts rests with the moving party:

> [A] party seeking summary judgment always bears the initial
> responsibility of informing the district court of the basis for its
> motion, and identifying those portions of "the pleadings,
> depositions, answers to interrogatories, and admissions on file,
> together with affidavits," if any, which it believes demonstrates the
> absence of a genuine issue of material fact.

*Celotex*, 477 U.S. at 323 (citing Fed. R. Civ. P. 56(c)). A fact is "material only if its resolution

will affect the outcome of the lawsuit." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

Accordingly, the nonmoving party must present "significant probative evidence" to demonstrate

that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip*

*Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir.1993). The nonmoving party may not simply rely on

its pleading, but must "produce evidence that results in a conflict of material fact to be solved by

a jury." *Cox v. Kentucky Dep't. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995).

The evidence, all facts, and any inferences that may permissibly be drawn from the facts

must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co.*

*v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Eastman Kodak Co. v. Image Technical Servs.,*

*Inc.*, 504 U.S. 451, 456 (1992). However, "[t]he mere existence of a scintilla of evidence in

support of the plaintiff's position will be insufficient; there must be evidence on which the jury

could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

Summary judgment should be granted if a party who bears the burden of proof at trial

does not establish an essential element of his case. *Tolton v. American Biodyne, Inc.*, 48 F.3d

937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. at 322). Moreover, if the evidence is "merely

colorable" and not "significantly probative," the court may decide the legal issue and grant

summary judgment.  *Anderson*, 477 U.S. at 249-50 (citation omitted).

**ANALYSIS**

      1.     The complaint

         A.     Breach of contract[14] (Purchase Orders)    count one

Plaintiff moves for summary judgment as to liability only with respect to its breach of contract claim.  According to plaintiff, defendant breached the Purchase Orders[15] by failing to timely deliver the hunting blinds.  Plaintiff claims that the timing of defendant's performance was "of the essence" and, therefore, material to the parties' agreement.

In response, defendant argues that plaintiff suffered no damages as a result of any delay in delivery and waived any entitlement to lost sales and lost profits.  According to defendant, plaintiff accepted all of the blinds without objection and, as such, O.R.C. § 1302.65 bars plaintiff's claim now.  In addition, defendant argues that its invoices negate any claims for delivery delays because a C.I.F. contract places delivery delays on the purchaser.  Defendant also

---

[14]     Plaintiff argues that Ohio law, and specifically Ohio's adoption of the Uniform Commercial code as set forth in O.R.C. § 1302.02, applies to this dispute.  Defendant does not object.  In addition, neither party disputes that an enforceable contract exists.

[15]     The Court finds that the Purchase Orders containing the second page, which are attached to defendant's motion as Exhibit D, are the relevant purchase orders the Court must consider.  At her deposition, Forsdahl identifies the purchase orders attached to defendant's motion as Exhibit E as the purchase orders presented to her on May 17, 2018.  The Exhibit E purchase orders are the same as the Exhibit D purchase orders with two exceptions.  The quantity and amount are redacted in Exhibit E, but the parties do not dispute the accuracy of those terms.  And, the purchase orders in Exhibit E do not contain the terms on the second page.  By separate Order, however, the Court rejected Fosdahl's attempt to contradict her deposition testimony regarding the second page.

13

claims that plaintiff breached the parties' agreement in the first place and, as such, plaintiff cannot show its own performance. According to defendant, this is fatal to plaintiff's claim for breach of contract.

In reply, plaintiff argues that it is, in fact, seeking damages. Plaintiff acknowledges that it cannot recover for lost sales and lost profits, but argues that it is seeking other damages, including but not limited to, additional transportation costs incurred as a result of defendant's delay in shipment. According to plaintiff, the fact that it is moving for summary judgment with respect to liability only, does not equate to an admission that it suffered no damages. In addition, plaintiff argues that its acceptance of the goods does not preclude damages because plaintiff notified defendant about certain breaches, including damaged boxes. Plaintiff further argues that the terms of defendant's proforma invoices did not become part of the parties' agreement. Plaintiff also claims that the fact that the Purchase Orders are designated "CIF Cleveland" does negate the express terms of the Purchase Orders, which require shipment by certain dates.

The Court will first address the timeliness of delivery, as that is the basis for plaintiff's claim. Upon review, the Court finds that neither party is entitled to summary judgment on the issue of delivery. Pursuant to Ohio law, "[t]he time for shipment or delivery or any other action under a contract if not provided in sections 1302.01 to 1302.98...or agreed upon shall be a reasonable time." O.R.C. § 1302.22. Defendant does not argue that time was not "of the essence" or that any failure to deliver the hunting blinds by the agreed upon dates would constitute an immaterial breach. Therefore, the Court finds that, as a matter of law, the delivery dates constitute a material term of the parties' agreement.

Plaintiff points to evidence demonstrating that defendant failed to meet delivery dates and

14

that this failure was "chronic." (Doc. 110-2, Reaser Decl. At par 7). In order to ascertain whether defendant breached the delivery provision, the Court must first address what constitutes "delivery." As defendant points out, the parties do not dispute that this agreement is a "CIF" agreement. Pursuant to statute, "[t]he term C.I.F. means the price includes in a lump sum the cost of the goods and the insurance and freight to the named destination." O.R.C. § 1302.33(A). Under a CIF contract, the seller must: (1) put the goods into the possession of a carrier at the port for shipment; (2) load the goods and obtain a receipt from the carrier showing that the freight charge has been paid; (3) obtain an insurance policy covering the same goods identified on the bill of lading; (4) prepare an invoice for the goods and other documents required to effect shipment; and (5) "forward and tender with commercial promptness all the documents in due form and with any indorsement necessary to perfect the buyer's rights."

The Official Comment to this section provides, in relevant part:

Delivery to the carrier is delivery to the buyer for purposes of risk and 'title.' Delivery of possession of the goods is accomplished by delivery of the bill of lading, and upon tender of the required documents the buyer must pay the agreed price without awaiting the arrival of the goods and if they have been lost or damaged after proper shipment he must seek his remedy against the carrier or insurer.

Based on the foregoing, the Court finds that, as a matter of law, defendant's performance is accomplished under the parties' agreement if defendant loaded the goods onto a ship in China, obtained insurance for the goods, and forwarded the proper documents. In this case, neither party claims that defendant failed to obtain insurance for the goods. The parties do, dispute, however, whether defendant timely loaded the goods at a port in China and whether defendant forwarded the proper bills of lading.

The issue regarding the timeliness of delivery to the Chinese ports relates to both parties'

15

motions for summary judgment. Here, both parties argue that the other breached the Purchase Orders. Plaintiff argues that there is no evidence that plaintiff timely delivered the goods to a Chinese port and, therefore, defendant cannot establish its own performance. Defendant, on the other hand, essentially argues that it did comply with the Purchase Orders and plaintiff refused to pay even after it delivered the goods to the Chinese ports. Upon review, the Court finds that a genuine issue of material fact exists with respect to the timeliness of defendant's deliveries to ports in China. Simply put, neither party provides sufficient evidence on this issue. The Court will not parse through the record on an invoice by invoice basis in an attempt to ascertain the dates the goods reached the ports. Moreover, having reviewed the invoices, as well as all of the evidence submitted by the parties, this information does not appear in any cogent form. This is exacerbated by the fact that no party points the Court to any analysis on an invoice by invoice basis. Having attempted to determine the dates of delivery itself, it appears to the Court that at least *some* of the goods were timely delivered to a Chinese port. Because the parties cross-moved for summary judgment, each would bear the burden of proof of this issue. Since a genuine issue of material fact exists as to when the goods were delivered to port with respect to each invoice, the Court cannot say that either party is entitled to summary judgment.

The Court next turns to whether defendant performed under the contract by delivering the "required documents." Here, the "required documents" include delivery of the bills of lading for each shipment. The Court finds that a question of fact exists as to whether defendant provided timely bills of lading. Plaintiff argues that it received some bills of lading, but that they continued to list defendant as the "consignee," and defendant continued to arrange shipment after the goods arrived in the United States. According to plaintiff, this is inconsistent with any

16

argument that payment should have been made, since the "consignee" remains the owner. On the other hand, defendant cites to a string of internally forwarded emails in which it purports to have emailed bills of lading to plaintiff. (Doc. 118 2, at PageID 4926-4941). Although it appears that many of the bills of lading may have been provided shortly after the goods left port, not all of them contain sufficient information to ascertain whether the delivery of the bill of lading coincided with the timing of shipment. Accordingly, the Court finds that a question of fact remains as to whether defendant properly provided all bills of lading to plaintiff.

Because questions of fact remain as to whether defendant timely performed, summary judgment on this issue is not appropriate for either party. As such, plaintiff's breach of contract claim remains pending and the Court need not address defendant's remaining arguments.

      B.    Breach of contract (non-disclosure and non-compete agreements)   count three

Defendant argues that it is entitled to summary judgment with respect to count three of the amended complaint. According to defendant, count three is based on defendant's indication that it intended to sell the hunting blinds that it possessed to a third party. Defendant claims that this never occurred and plaintiff does not dispute that it is now in possession of all of the hunting blinds at issue. In response, it appears that plaintiff argues that any attempt by defendant to sell the blinds breached the parties' non-disclosure and non-compete agreements. The Court disagrees. In its opposition brief, plaintiff cites to two provisions of the non-disclosure agreement that it claims defendant breached. But, both of those provisions address the disclosure of "Confidential Information." Plaintiff does not identify what constitutes "Confidential Information." Regardless, plaintiff cites no information disclosed by defendant. Rather, plaintiff

17

cites to the deposition of its president, at which he testified that defendant informed him that it was going to attempt to sell the product on the marketplace. Plaintiff's president further testified that he was contacted by Wal-Mart, one of plaintiff's customers. Wal-Mart informed plaintiff that it had been contacted by defendant and was told that defendant possessed a lot of inventory that was available on short notice. (Doc. 791, Reaser Dep. at 35-36). In addition, defendant contacted Bass Pro, another of plaintiff's customers. There is no indication that any "Confidential Information" was ever disclosed. Accordingly, defendant is entitled to summary judgment with respect to plaintiff's claim that defendant breached the non-disclosure agreement.

The Court further finds that defendant is entitled to summary judgment with respect to plaintiff's allegations that defendant violated the parties' non-compete agreement. The two provisions cited from the non-compete agreement also require the use or disclosure of "Confidential Information." Again, plaintiff wholly fails to identify what "Confidential Information" was either "used" or "disclosed" in any communication defendant had with either Wal-Mart of Bass Pro. The Court cannot simply presume that improper information was used or disclosed. For this reason, the Court finds that defendant is entitled to summary judgment with respect to the entirety of count three.

    2.    The counterclaim

        A.    Breach of contract    count one

The parties cross-move with respect to defendant's breach of contract claim. There appear to be a number of issues arising with respect to this claim. The Court will address these issues in the most cogent way possible.

    Breach

18

Defendant argues that plaintiff breached the Purchase Orders by failing to timely pay for the goods once the goods reached the port in China. In addressing plaintiff's breach of contract claim, the Court determined that a question of fact exists as to whether defendant timely delivered the hunting blinds. Thus, defendant is not entitled to summary judgment with regard to the timeliness of plaintiff's payment. In addition, there is some evidence that plaintiff did not timely pay for goods once the goods reached port. By way of example, defendant cites an email in which it is requesting payment for nine containers that have already arrived in the United States, but for which defendant has not yet been paid. (Doc. 119-9) In response, plaintiff notes that it, in fact, paid defendant for those nine containers later that day. But, the problem is that payment was due to defendant when the goods were loaded in China. Although it appears that plaintiff failed at least sometimes to timely pay at the time the goods were loaded on the dock in China, it does appear that at least some delay occurred in getting the goods to the Chinese port as the quantities identified on the invoices do not match the delivery dates set forth on the Purchase Orders. Because the Court in essence cannot ascertain "who breached first," neither party is entitled to summary judgment on the issue of its own performance.

Defendant next argues that plaintiff breached the contract by failing to pay plaintiff a 50% deposit. According to defendant, the proforma invoices required such a deposit. In response, plaintiff argues that the Purchase Orders do not contain such a term. Plaintiff argues that pursuant to O.R.C. § 1302.10(B), the 50% deposit term never became part of the parties' agreement. That section provides in relevant part,

> (A) A definite and seasonable expression of acceptance or a written confirmation that is sent within a reasonable time operates as an acceptance even though it states terms additional or different from those offered or agreed upon, unless acceptance is expressly

19

made conditional on assent to the additional or different terms.

(B) The additional terms are to be construed as proposals for addition to the contract. Between merchants, the terms become part of the contract unless one of the following applies:

   (1) The offer expressly limits acceptance to the terms of the offer.

   (2) They materially alter it.

   (3) Notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

Here, plaintiff argues that the 50% deposit requirement set forth in the Proforma invoices amounts to an "additional" term that materially alters the parties' agreement. As such, it never became part of the contract. Defendant disputes this assertion.

A term constitutes a "material alteration" if it would result in a "surprise or hardship" to the offering party. *See, Goodyear Tire & Rubber Co. v. Chiles Power Supply, Inc.*, 7 F.Supp.2d 954 (N.D. Ohio June 3, 1998)(sending to jury issue as to whether term constituted a "material alteration"). Upon review, the Court finds that a question of fact exists as to whether the deposit term ever became part of the agreement. On the one hand, days before the Purchase Orders were delivered to defendant, defendant emailed plaintiff indicating that "I had expected to have the full 50% deposit by now...but we are nowhere near that level yet." (Doc. 104-9) Thus, an argument can be made that the term set forth in the proforma invoices containing the 50% deposit obligation did not "materially alter" the terms because it was not a surprise to plaintiff, nor did it work an undue hardship. On the other hand, plaintiff cites an email it sent to defendant within one month of the submission of the Purchase Orders. That email provides, "Good morning. We have several items that we need to resolve; You have requested an additional deposit of

20

$250,000; based on our discussion last week, we agreed on $200,000 for last week, and $200,000 for this week. We'll forward the $200,000." (Doc. 115-6). Arguably, this evidence demonstrates that defendant objected to the inclusion of the 50% deposit term and the parties subsequently agreed on a different term. Because reasonable minds could differ as to whether the 50% deposit term became part of the parties' agreement, a question of fact exists as to whether plaintiff breached this term.[16]

Unpaid product

Plaintiff argues that it is entitled to summary judgment with respect to defendant's breach of contract claim because it is undisputed that defendant delivered all required blinds and plaintiff paid more than the contract price. Therefore, defendant suffered no damages. Plaintiff points out that the parties agree that defendant delivered all of the blinds. In addition, both parties agree that the cost of these blinds (not including items such as freight or storage) totaled $5,689,432.30. (Doc. 107-1, Forsdahl Dep. II at 16). Defendant acknowledges that plaintiff has paid a total of $5,705,527.31. (Id. at 21-24)(acknowledging receipt of $3,935,279.91, $1,750,674.15, and $19,573.25). Moreover, defendant fails to point to any evidence regarding its alleged entitlement to $154,829.95 for "unpaid product." Rather this figure is completely unsubstantiated. For both of these reasons, the Court agrees that plaintiff is entitled to summary

---

[16]     Although plaintiff points out that large deposits were made, plaintiff does not appear to dispute that it never paid 50% of the deposits upfront. *See, e.g.*, Doc. 115 at PageID 4649 ("by the end of June 2018, [plaintiff] had paid defendant $1.4 million for the order," but also noting in its briefing that the value of the Purchase Orders totaled approximately $5.68 million)

judgment to the extent defendant is seeking damages for unpaid product.[17]

On the other hand, the Court finds that a question of fact exists on the issue of damages for additional freight and storage. It appears that during the performance of the agreement, the parties agreed to change the port of entry from Cleveland to the west coast. The hunting blinds were then to be transferred by train to Cleveland. It appears that defendant agreed to pay these charges. But, ultimately, the blinds were trucked from the west coast to Cleveland. In addition, some blinds remained in storage arguably due to plaintiff's failure to timely remit the deposit and/or to timely pay plaintiff when the goods were loaded on the vessel in China.[18] Because there are questions of fact as to which party breached the Purchase Orders at what point in time, the Court cannot say which party is liable for these additional freight and storage costs. Accordingly, neither party is entitled to summary judgment on this issue.

Duty charges

The parties cross-move for summary judgment on the issue of duty charges. According to defendant, a CIF contract requires the buyer to pay all duty charges as a matter of law. Defendant further points out that it questioned plaintiff as to whether plaintiff wanted the price quoted LDP (landed duty paid) or CIF delivered to port. Plaintiff responded, "just to port." In addition, defendant provides the affidavit of its owner who avers that plaintiff initially paid duty charges.

---

[17]     The Court notes that it appears that defendant invoiced plaintiff for items such as storage costs and trucking fees. These charges, however, are not part of the Purchase Orders. Therefore, the Court views these amounts as additional damages plaintiff must prove entitlement to separate and distinct from any failure to pay for the product.

[18]     The reason why all of the storage costs were incurred is not sufficiently clear to the Court.

22

In response, plaintiff argues that this is an agreement between two merchants from the United States and that, as such, no duty was ever contemplated. Plaintiff further points out that its president indicated that if defendant intended to pass on duty charges, then plaintiff would cancel all outstanding Purchase Orders. The orders were never canceled. Plaintiff also notes that the import documents reflect that defendant owned the blinds upon importation into the United States. According to plaintiff, this is inconsistent with a traditional CIF contract.

Upon review, the Court finds that a question of fact exists as to which party must pay the duty charges associated with importation. As an initial matter, the Court rejects plaintiff's assertion that this cannot be an overseas CIF contract because neither signatory is located overseas. Plaintiff cites no law in support of this contention. It is undisputed that plaintiff knew of duty charges and further knew that the goods were being manufactured and imported from China. Thus, the Court cannot say that the fact that the contract is between two United States companies mandates that defendant pay the costs associated with importation.

The same holds true with respect to defendant's argument that the designation CIF has a preclusive effect on this issue. According to defendant, under a CIF contract, the buyer is required to pay the duty costs. Defendant cites case law in support of this proposition. On the other hand, plaintiff argues that the shipping documents show that defendant was the "importer of record," which is inconsistent with a traditional shipping contract. Regardless, neither party cites any law that would prevent the parties from separately agreeing as to who is responsible for duty charges, even if the contract is designated CIF Accordingly, the Court finds that the CIF designation is not necessarily dispositive of the issue.

In addition to the foregoing, the Court finds the remaining evidence the parties cite to

demonstrates that reasonable minds could differ as to which party is responsible for duty costs.

Defendant points out that it questioned plaintiff in 2017 regarding the quote. Specifically, defendant asked whether plaintiff wanted the price quoted LDP (landed duty paid) or CIF delivered to port. In response, plaintiff indicated "just to port." The implication is that defendant expected plaintiff to pay the duty costs, otherwise there would be no reason to ask whether the quote should include duty. On the other hand, a reasonable juror could possibly interpret plaintiff's response to mean that it was only willing to agree to a contract that did not include duty charges.

The remaining evidence also creates a question of fact. There is a dispute as to whether plaintiff ever paid duty during the course of the parties' relationship. According to defendant, plaintiff paid duty charges "early on." But, plaintiff disputes this assertion and claims that it lodged an objection to the payment of duty charges. The competing evidence in this regard precludes summary judgment in favor of either party. Defendant's owner testified as follows:

Q: And is it your testimony that you explained it to Dan?

A: When I, we specifically had the conversation when I told him about paying duty invoices quickly and that's when him and I had the discussion that I explained my prices do not include duty and that was obviously an issue for him and he wanted us to absorb it and I said well, I can't absorb it and he said well, I'm going to cancel the order and I said well, then cancel the order....

The parties agree that the orders were never canceled. On the other hand, however, plaintiff provides the affidavit of its president, who avers as follows:

In April 2018, [plaintiff] received an invoice from [defendant] for duty and inland freight truck charges from LA to Elyria. I specifically questioned [defendant] on the duty charge. I specifically stated to [defendant] that if [it] intended to invoice [plaintiff] for duty charges, then [plaintiff] would cancel all outstanding [purchase orders]. [Defendant] indicated that it would not invoice [plaintiff] for duty charges. As a result, [plaintiff] did

not cancel the [purchase orders].

Defendant also relies on the fact that plaintiff suggested a code to be used to attempt to avoid duty costs altogether. The Court agrees that a reasonable juror could conclude that plaintiff did so in an effort to eliminate duty charges it would otherwise incur. Alternatively, however, a reasonable juror could determine that plaintiff simply attempted to help defendant reduce the duty charge defendant would be responsible for paying.

On the whole, the Court finds that reasonable minds could disagree on which party bears the cost of the duty charges. As such, summary judgment is not warranted.

VAT

The parties also cross-move for summary judgment on the issue of whether plaintiff bears responsibility for VAT. In essence, VAT are assessed by China with respect to goods manufactured therein. If goods are timely exported, VAT rebates of 99% are available. VAT are only assessed against Chinese manufacturers. Here, defendant claims that the Chinese manufacturers it used were assessed VAT as a result of plaintiff's failure to timely pay the invoices. Due to the lack of timely payment, the VAT rebate was lost and, subsequently, a 100% penalty was assessed.

Plaintiff argues that defendant lacks standing to assert this portion of its breach of contract claim because defendant was never assessed with VAT. In fact, defendant acknowledges that it cannot be assessed VAT because it is not permitted to manufacture goods in China. According to plaintiff, defendant lacks standing to assert claims belonging to unnamed third parties. In response, defendant argues that its Chinese manufacturers are demanding payment for VAT. As such, it does have standing to recover these funds from plaintiff. In the

alternative, plaintiff argues that there is no admissible evidence supporting defendant's claim that anyone actually incurred VAT or that VAT are due and owing by any party.

Upon review, the Court finds that summary judgment in favor of plaintiff is warranted on this issue. Defendant offers testimony from its owner, Dan Graves, who avers as follows:

> 10. Due to plaintiff's non-payment and late payments, a VAT tax rebate in China was lost.

> 11. Due to plaintiff's non-payment and late payments, a VAT tax penalty of 100% was assessed in May 2019.

> 12. [Defendant's] Chinese manufacturers and suppliers are demanding that [defendant] pay these VAT amounts to them through the government entity Shanghai Decorators. A true and accurate copy of the Chinese demand and assessment of these VAT taxes and penalties is attached hereto as Exhibit "20."

> 13. Shanghai Decorators is a Chinese Government company and the assessment attached hereto is an official government document stamped by the Chinese government.

> 14. Plaintiff has not paid [defendant] or any third party for the VAT or VAT tax penalty.

> 15. Plaintiff owes [defendant] $472,770.10 for VAT taxes and another $472,770.10 for the VAT penalty.

(Doc. 104-19, at PageID 2199).

The document attached to Paragraph 12, (*i.e.*, Exhibit 20), is an email purportedly from Shangtex Decoration Co., Ltd., which contains a stamp marked "Shanghai Textile Decoration Corp. (Group)." The letter is addressed to defendant and discusses that there is an unresolved payment problem. It goes on to note that the Shangtex company will face "big trouble because not receive your payment and mill VAT invoice both." It then asks defendant to "push" plaintiff and arrange all payments. It notes that there will be a tax refund loss of approximately

$472,770.10, as well as an additional penalty in the same amount.

Plaintiff argues in its motion that the email and the affidavit constitute hearsay and further claims that the email cannot be properly authenticated. In response, defendant argues that the email is a "certified, official document from the Chinese government." Defendant further argues that the Graves affidavit sets forth the "amounts due and owing."

Upon review, the Court finds that defendant fails to introduce sufficient admissible evidence from which a jury could conclude that defendant's manufacturers or suppliers incurred a VAT that defendant may be responsible to pay. Initially, paragraphs 10, 11, and 13 of the Graves affidavit are not admissible because the statements are not based on personal knowledge. In those paragraphs, Graves purports to testify as to what happened in China with respect to China's assessment of VAT against a Chinese supplier. Defendant admittedly was not part of any assessment or rebate. Nor may Graves testify that Shanghai Decorators is a "Chinese Government company," or attest to the authenticity of an "official" government document. With regard to the email, the Court agrees with plaintiff that it constitutes inadmissible hearsay. Defendant purports to rely on the document to show that its manufacturers and suppliers incurred VAT that they intend to pass on to defendant. Thus, defendants are offering the contents of the document to prove that these statements are true. Defendant, however, offers no testimony from these manufacturers or suppliers. Thus, the email constitutes inadmissible hearsay unless an exception applies. Defendant does not point to any exception that it believes applies here. Having reviewed the exceptions, the Court notes that arguably the document could be considered a business record under Fed.R.Evid. 803(6). In order to satisfy that exception, however, defendant must have provided a certification that complies with Rule 902(12), as this document

is a foreign record.  But that provision requires an attestation, in essence, under the penalty of perjury.  As an initial matter, the email contains only a random stamp and no signed certification whatsoever.  Moreover, during the course of discovery on this issue, it became apparent that China prevents the taking of an oath.  Accordingly, Rule 902(12) is not satisfied.  Because defendant fails to point to an applicable exception to the hearsay rule, the Court will not consider the email.[19]  In short, the Court has no admissible evidence indicating that any Chinese manufacturer or supplier incurred any VAT charges.  All of the evidence defendant relies upon in this regard is inadmissible hearsay.  As such, plaintiff is entitled to summary judgment on the issue of VAT.   Having so concluded, the Court need not reach the parties' remaining arguments.

### Damaged product/delivery delays

Defendant argues that the terms of its proforma invoices place the risk of loss on plaintiff. In other words, according to defendant, it cannot be liable for damaged product or delivery delays as a matter of law.  The Court disagrees.  The provision defendant relies on provides, "[g]oods are delivered throughout common carriers...are at the risk of the buyer.  In no event shall the seller be liable for...late deliveries, damages for breach of contract by buyer, or other...losses." While this provision may prevent plaintiff from recovering for late deliveries caused by carriers,

---

[19]    Although it is unclear whether defendant is arguing that, standing alone, Graves's statement that manufacturers and suppliers are "demanding payment" for VAT is sufficient to create a question of fact, the Court finds that it is not.  In order to impose liability on plaintiff for VAT, the jury would need to hear *some* admissible evidence that the VAT was actually incurred by the suppliers and manufacturers.  The same is true with respect to Paragraph 14 and 15 of the Graves affidavit.  Those paragraphs simply indicate that plaintiff did not pay defendant the amount defendant believes it may be obligated to pay for VAT.

it does not, on its face, have any bearing on late deliveries caused by defendant's failure to timely manufacture the goods and deliver those goods to the common carrier. Nor, as plaintiff asserts, does it prevent plaintiff from recovering for any failure on the part of defendant to properly package the goods as required.

Attorneys' fees and interest

Defendant argues that the terms of its proforma invoices require that plaintiff pay attorneys' fees and interest as a result of plaintiff's breaches. Defendant further appears to argue that attorneys' fees should be awarded based on plaintiff's conduct. Because a question of fact exists as to whether plaintiff breached the Purchase Orders, the Court finds that summary judgment on the issue of attorneys' fees and interest is not warranted.

### B. Accounting count two

Because the Court finds that there are genuine issues of material fact precluding summary judgment with respect to defendant's breach of contract claim, the Court finds that summary judgment is not warranted with respect to count two, defendant's claim for an accounting.

### C. Fraud count three

The parties cross-move with respect to defendant's fraud claim. Upon review, the Court finds that plaintiff is entitled to summary judgment. During the course of this matter, defendant attempted to amend its counterclaim. According to defendant, plaintiff misrepresented its ability to pay. Defendant claims that plaintiff falsely informed defendant that its bank would not release funds. The Court denied defendant's request for leave to amend on the basis that the amendment would be futile. Defendant again makes the same argument previously rejected by this Court. Defendant makes no other arguments in support of its fraud claim. Thus, even if this aspect of

defendant's fraud claim were actually pending, the Court would grant summary judgment in favor of plaintiff for the same reasons it denied leave to amend in the first instance. (*See*, Doc. 97.)

D.     Liquidation of hunting blinds    count four

Plaintiff argues that this claim is moot and defendant does not dispute this assertion. Accordingly, the claim is DISMISSED as MOOT.

E.     Local Rules

Plaintiff argues that defendant's brief in opposition to plaintiff's motion for summary judgment should be stricken from the record for failure to comply with the page limits set forth in the Local Rules.  The Court declines to exercise its discretion in this fashion.  The brief exceeds the page limitations by one and half pages.  But, defendant incorporates images of certain exhibits, which assisted the Court in addressing the motion.  In some instances, these images take up substantial space.  (*See, e.g.*, Doc. 112 at PageID 4952).  Although the Court cautions defendant that in the future leave must be sought, the Court declines to strike defendant's brief.

**CONCLUSION**

For the foregoing reasons, defendant's motion (Doc. 101) is GRANTED in PART and DENIED in PART and plaintiff's motion (Doc. 110) is also is GRANTED in PART and DENIED in PART.  Defendant is entitled to summary judgment with respect to counts two, three, four, and five of the complaint.  Count one, however, remains pending.  Plaintiff is entitled to summary judgment with respect to count one of the counterclaim to the extent it seeks recovery for unpaid product and VAT.  Count one of the counterclaim remains pending in all other respects, and count two of the counterclaim remains pending.  Plaintiff is entitled to

summary judgment with respect to count three of the counterclaim and count four of the

counterclaim is DISMISSED as MOOT.

IT IS SO ORDERED.


 /s/ Patricia A. Gaughan
PATRICIA A. GAUGHAN
United States District Judge
Dated: 2/20/20                    Chief Judge